IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * CRIMINAL NO. 5:23-CR-00174 |
| | * |
| VERSUS | *  DISTRICT JUDGE HICKS |
| | * |
| JOHN WAYNE MORGAN  JR. | * MAGISTRATE JUDGE HORNSBY |

## UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS INDICTMENT

## I.      INTRODUCTION

NOW COMES the United States of America, through undersigned counsel, who respectfully opposes the motion to dismiss the indictment filed by the defendant, John Wayne Morgan, Jr.  which challenges the constitutionality of the federal felon-in-possession statute: Title 18, United States Code, Section 922(g)(1); and the illegal receipt of an unregistered National Firearm Act weapon: Title 26, United States Code, Section 5861(d). (Rec Doc. 18.)

In *Bruen*, the Supreme Court held that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. However, *Bruen* did not call into question felon dispossession statutes like Section 922(g)(1) or Section 5861(d) and is therefore inapplicable in this case. And, even if *Bruen* did

**Page 1 of 24**

apply, these sections would satisfy its historical analogy test. Accordingly, and for the reasons set forth below, the defendant's motion to dismiss the indictment should be denied.

## II.    BACKGROUND

On March 22, 2023, a federal grand jury returned a three-count indictment charging the defendant with Count One - violating Section 922(g)(1), for being a felon in possession of firearms, for Count Two- Possessing a Stolen Firearm in violation of 18 U.S.C. Section 922(j); and Count Three- Theft of a Firearm from an FFL. (Rec. Doc. 1). The defendant became a convicted felon in 2014 when he was convicted for simple burglary.

On April 9, 2023, Shreveport Police Department (SPD) was conducting a patrol when Officer Lindsay observed a red Mercedes travel westbound on the 3700 block of Valley View Dr. in Shreveport, LA. Officer Lindsay saw the vehicle fail to activate their turn signal 100 feet before turning (activated at the Stop sign) and not come to a stop until after the Stop sign. The vehicle turned northbound, and Officer Lindsay followed and initiated a traffic stop. The Mercedes put on its hazard lights but did not immediately stop. Instead, the vehicle would begin to stop and then get back on the roadway and accelerate. The Mercedes turned multiple times further into a neighborhood before stopping in a driveway at 3922 Liaison. Once there, the driver's side door opened and Officers Lindsay and Hyde made contact with the driver, Sa'Mya Taylor. The front passenger, Juvenile M.W., was ordered out of the vehicle and John Morgan, Jr. in the back seat behind the passenger's seat was ordered out

as well. While Morgan, Jr. was being pat down for weapons, Officer Lindsay observed an AK-47 style weapon protruding from underneath the front passenger seat, directly in front of where Morgan, Jr. was seated. Morgan, Jr. was placed in handcuffs and Officer Lindsay could see in plain view a clear extended handgun magazine underneath the front of the front passenger seat and marijuana residue on the front passenger floorboard. SPD then conducted a search of the vehicle.

The search found four firearms: (1) a Glock pistol, model: 23 Gen 4, cal: .40, (2) a Glock pistol, model 21 Gen 4, cal: .45; (3) a Bushmaster SBR model XM15-E2S cal: 223-5.56mm; and (4) a Century Arms International AOW; model: Micro Draco; caliber: 7.62x39 mm. All of the firearms were loaded. The Micro Draco was found to be stolen from 2019.

An examination of the firearms determined the Century Arms International and Bushmaster SBR were both modified and required the weapons to be registered under the National Firearms Act. The Century Arms for a handguard with a vertical grip and the Bushmaster had a short-barrel (9 inches) and an overall length of 25 inches making it a short-barreled rifle. Neither weapon nor any of the individuals in the vehicle came up on the registry.

John Wayne Morgan, Jr. is a convicted felon, having a conviction for Illegal use of a firearm in 2023. He received a two year sentence. He was revoked on his parole.

A Nexus exam was conducted by SA Megan McWaters and it was determined all of the firearms were manufactured outside of Louisiana and had traveled in Interstate Commerce.

### III.   LAW AND ARGUMENTS

1.   **SECTION 922(G)(1)'S PROHIBITION ON GUN POSSESSION BY FELONS IS CONSTITUTIONAL.**

This Court should deny the defendant's motion to dismiss the indictment for two reasons. First, the defendant argues that Section 922(g)(1) violates the Second Amendment of the United States Constitution based on principles articulated in *Bruen*. This Court should reject that argument because *Bruen* did not call into question felon-dispossession statutes and is therefore inapplicable in this case. *Bruen* concerned firearm regulations aimed at "law abiding citizens" and not a statute—Section 922(g)(1)—whose own elements limit itself to regulating non-law-abiding citizens.

Second, even if *Bruen* applied, Section 922(g)(1) would satisfy its historical analogy test as the Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed, and this Nation's historical tradition also confirms that felons can be dispossessed of firearms.

### A.   <u>*Bruen* did not call into question felon-dispossession statutes and, therefore, does not apply to this case</u>.

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Section 922(g)(1) criminalizes the possession of firearms by convicted felons. The United States Court

of Appeals for the Fifth Circuit has routinely upheld Section 922(g)(1) and found it "does not violate the Second Amendment." *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003); *see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (reaffirming *Darrington* post-*Heller*).

In *Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. 554 U.S. at 635. *Heller* also clarified that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26.

Similarly, in *Bruen*, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside of their homes because the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

Importantly, *Bruen* does not question *Heller*'s statements about longstanding prohibitions, such as the dispossession of firearms by felons. For example, Justice Alito explained in concurrence that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."  142 S. Ct. at 2157 (Alito,

J., concurring) (cleaned up). And Justice Kavanaugh (joined by the Chief Justice) emphasized that "the Second Amendment allows a 'variety' of gun regulations" and reiterated *Heller*'s statement about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J., concurring) (quotations omitted).

Because *Bruen* did not overturn "longstanding prohibitions" like "possession of firearms by felons," this Court should not reconsider the constitutionality of Section 922(g)(1) in this case. *See, e.g.*, *United States v. Roy*, No. 22-10677, 2023 WL 3073266, at *1 (5th Cir. Apr. 25, 2023) (rejecting post-*Bruen* challenge to the constitutionality of Section 922(g)(1) on plain error review); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. Apr. 25, 2023) (same). Accordingly, the defendant's motion to dismiss should be denied.

**B.    Even if *Bruen* applied in this case, Section 922(g)(1) would survive its two-pronged test.**

Even if *Bruen* required this Court to consider Section 922(g)(1)'s constitutionality afresh, the defendant's arguments would still not prevail. *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burden such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Here, the Second Amendment's plain text and historical context do not prevent Congress from banning firearm

possession by felons. Moreover, even if the Second Amendment's plain text applied to the charged conduct in this case, Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.

> i.   *The Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed.*

Under *Bruen*, when considering the constitutionality of a firearms regulation, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Two independent aspects of the Amendment's text demonstrate that it does not prevent legislatures from disarming felons. And *Heller* and *Bruen*'s authoritative interpretation of the text confirm that view.

First, felons do not fall within "the people" protected by the Second Amendment, a term *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580. Legislatures have historically had wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitation," *id.* at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Felons could therefore be historically excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely

related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998). Indeed, today it remains the case that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership within the political community, including "the right serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

Second, regardless of whether felons fall within "the people," the "right . . . to keep and bear arms" has never been understood to prevent the disarming of felons. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision indicates that "the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law abiding to exercise the right to bear arms." *Range v. Attorney General*, 53 F.4th 262, 275 (3d Cir. 2022). Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers.

The Constitution's ratification debates support this understanding of the

Second Amendment's text. In what *Heller* called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir 2010) (en banc) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). This "Second Amendment precursor[ ]," *Heller*, 554 U.S. at 604, indicates that the Second Amendment allowed the legislature to disarm those who had committed serious "crimes" such as felonies. Thus, the Second Amendment's plain text, understood in its historical context, does not prevent Congress from disarming felons.

The Supreme Court's authoritative interpretation of the Second Amendment's plain text further confirms this view. *Heller* explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. *Heller* indicated that "prohibitions on carrying concealed weapons" were lawful. *Id.* It said that the Second Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotations omitted). And the Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Thus, in conducting its "textual analysis" of the Second Amendment, *id.* at 578, *Heller* saw no inconsistency between its plain

text and laws prohibiting "possession of firearms by felons," *id.* at 626.

Moreover, *Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635, a category which clearly excludes felons. *See United States v. Hernandez*, No 3:23-CR-0056-B, 2023 WL 4161203, at *6 (N.D. Tex. June 23, 2023) (citing *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)), and noting that "[f]elonies remain the most serious category of crime and reflect a 'grave misjudgment and maladjustment'"). *Bruen* echoed that definition, stating no fewer than fourteen (14) times that the Second Amendment protects the rights of "law-abiding" citizens." 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. And six justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain firearms regulations, such as prohibitions on the possession of firearms by felons, are constitutional. *See id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "'longstanding prohibitions on the possession of firearms by felons'" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626, 636)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).

Additionally, when "reiterat[ing]" the standard applicable to Second

Amendment claims, *id.* at 2129, *Bruen* endorsed the constitutionality of "shall-issue" firearm-carry licensing regimes, many of which deny licenses to felons either directly or through incorporating federal law. *See, e.g.*, La. Stat. Ann. § 40:1379.3(C)(6). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." 142 S. Ct. at 2138 n.9. The Court said that those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment in fact prevented legislatures from disarming felons. Thus, the Amendment's plain text—and the Supreme Court's decisions interpreting that text—demonstrate that the Amendment does not prohibit the disarming of felons.

> ### ii.  *The Nation's historical tradition also confirms that felons can be dispossessed of firearms.*

Section 922(g)(1)'s constitutionality is further confirmed by a review of "this Nation's historical tradition of firearm regulation." *Id.* at 2126. Specifically, two types of historical laws support Section 922(g)(1)'s constitutionality: (1) laws authorizing capital punishment and estate forfeiture for felons, and (2) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law.

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence for which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony

at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting.  2 Laws of the State of New York Passed at the Session of the Legislature (1785-1788) at 664-65 (1886). The act established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offense committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York passed a law severely punishing counterfeiting of bills of credit. 2 Laws of the State of New York Passed at the Session of the Legislature (1785–1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261.  In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a

Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the public whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of the commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both.  For example, a 1700 Pennsylvania law provided that any person convicted of "willfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811). A 1743 Rhode Island law provided that any

person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattels [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Id.* at 158, 160.

A second category of historical laws also provides an analogy to felon disarmament—laws that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. In 1689, the same Parliament that "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), also passed an "Act for the better secureing the Government by disarming Papists and reputed

Papists." 1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71.[1]  That Act provided that any Catholic who refused to make a declaration renouncing his faith could not possess any "Arms Weapons Gunpowder or Ammunition (other th[a]n such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defense of his House or person)." *Id.* at 72. The required oath "was a gesture of allegiance to the English government and an assurance of conformity to its laws." *Range*, 53 F.4th at 275.

American colonies enacted similar laws. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king. 7 Statutes at Large; Being a Collection of All the Laws of Virginia 35-36 (1820) (1756 law). These laws discriminating based on race or religion are repugnant and would be unconstitutional today for reasons having nothing to do with the Second Amendment, but they nevertheless demonstrate that colonial legislatures "had the power and discretion to use status as a basis for disarmament" even of non-violent groups. *Range*, 53 F.4th at 276 n.18.

During the Revolutionary War, Connecticut passed a law providing that any

---

[1]     Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 Journal of the House of Lords (1685-1691) 208-09 (reflecting enactment on May 11, 1689).

person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defense or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states, *see, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). Again, these laws demonstrate that, at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and trustworthy.

The right to bear arms is analogous to historical laws that made certain civic rights subject to forfeiture by individuals convicted of crimes. Felons were generally excluded from service on juries in eighteenth-century America. *See* Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65, 179 (2003). They were also generally excluded from voting. "[E]leven state constitutions adopted

between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons." *Green v. Bd. Of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967). Just as historical laws required persons convicted of felonies to forfeit civic rights, Section 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).

Both types of historical statutes discussed above demonstrate Section 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." 142 S. Ct. at 2132. *Bruen* identified two relevant metrics for this analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (emphasis and quotations omitted).

Under the first metric, Section 922(g)(1) imposes *no* "burden [on] a law-abiding citizen's right to armed self-defense." *Id.* at 2133. "[C]onviction of a felony necessarily removes one from the class of "law-abiding, responsible citizens' for the purpose of the Second Amendment." *Hamilton*, 848 F.3d at 626. Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and *less* severe than many historical felony-punishment laws, which often included

the death penalty and forfeiture of one's entire estate.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to adequately punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend, potentially in dangerous ways. Thus, Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation that felons can be dispossessed of firearms.

## 2. THE COMMERCE CLAUSE ELEMENT OF 922(G)(1) IS CONSTITUTIONAL

This Court should reject the Defendants' argument for motion to dismiss based on the interstate nexus element as it is settled law. In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court struck down 18 U.S.C. Section 922(q)'s prohibition against possession of firearms in a school zone based on a lack of sufficient nexus between possession of a firearm in a local school zone and interstate commerce. Defense attempts to extend *Lopez* to Section 922(g) have uniformly failed. *See United States v. Nash*, 627 F.3d 693, 696 (8th Cir. 2010) (rejecting *Lopez*-based challenge); *United States v. Schmidt*, 571 F.3d 743, 746 (8th Cir. 2009) ("*Lopez* is inapposite to the present case because 18 U.S.C. Section 922(g)(1) is structured differently from Section 922(q)") (citing *Lopez*, 514 U.S. at 562 stating "[T]his is because section 922(g) contains an interstate commerce element...."); *United States v. Rawls*, 85 F.3d 240,

242 (5th Cir. 1996) (joining all other circuits that have considered issue in rejecting *Lopez*-type challenge to Section 922(g)(1)).

### 3.  SECTION 6851(D)'S PROHIBITION ON SHORT BARREL RIFLES AND OTHER DANGEROUS GUNS IS CONSTITUTIONAL.

The Supreme Court has held that a ban on unregistered short-barreled shotguns does not violate the Second Amendment, and every court to address the issue has held the same for bans on unregistered short-barreled rifles. *Bruen* did not upset any of that law, and instead supports it. Historical evidence likewise supports the conclusion that the law here is constitutional. The Court should thus reject defendant's Second Amendment challenge to Section 5861(d) as applied to unregistered short-barreled rifles and other dangerous weapons.

### A.  Precedent shows that the ban on unregistered short-barreled rifles does not violate the Second Amendment.

The Supreme Court has stated that the Second Amendment does not protect "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). That is, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. Precedent upholding the ban on unregistered short-barreled shotguns confirms as much. *See Miller*, 307 U.S. at 178. In an unpublished opinion, the Ninth Circuit applied that precedent to short-barreled rifles and held that there was no "right to possess" them. *Gilbert*, 286 F. App'x at 386. The Tenth Circuit reached a similar conclusion, deeming short-barreled rifles "close analogues" of short-barreled shotguns that "fall[] outside the Second Amendment

guarantee." *Cox*, 906 F.3d at 1185. The Eighth Circuit too rejected a challenge to the ban on unregistered short-barreled rifles, albeit on plain-error review. *See United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (unpublished). This Court can follow the same path. Nothing in *Bruen* points to a different conclusion. As Justice Alito noted, the opinion "does not decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2147 (Alito, J., concurring). The little the opinion did say on the matter only reinforced prior precedent. The Court reiterated that the Second Amendment does not protect "dangerous and unusual weapons" and cited a passage from *Heller* that quoted *Miller* as support. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). Justice Kavanaugh, joined by Chief Justice Roberts, likewise cited portions of *Heller* that cited *Miller* and confirmed the constitutionality of bans on dangerous and unusual weapons. *Id.* at 2162 (Kavanaugh, J., concurring). Thus, *Bruen* is consistent with prior precedent from the Supreme Court on the issue and with circuit-court precedent addressing short-barreled rifles.

**B.** **The law banning unregistered short-barreled rifles and other dangerous weapons is supported by analogous historical laws banning dangerous and unusual weapons.**

Defendant's argument about the ban on unregistered short-barreled rifles would fail even if the Court were to give it fresh consideration without looking to earlier precedent. As noted, at the time of the Second Amendment's ratification, regulations of dangerous and unusual weapons were well-accepted. See *Bruen*, 142 S. Ct. at 2143; *Heller*, 554 U.S. at 627. So were regulations targeting the concealment of even those weapons that were not dangerous and unusual. *See Bruen*, 142 S. Ct.

at 2150 ("The historical evidence from antebellum American" shows that "States could lawfully eliminate one kind of public carry— concealed carry—so long as they left open the option to carry openly."); *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (stating in dicta that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons"). Thus, short-barreled rifles, like short-barreled shotguns, may be banned because they are dangerous and unusual concealable weapons. "It is of course clear from the face of the Act that the [National Firearms Act]'s object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); see also *id*. at 526 (Stevens, J., dissenting) ("This statute serves the critical objective of regulating the manufacture and distribution of concealable" and "dangerous weapons."). The law's history, which indicates that it was passed to address violence by targeting concealed weapons, confirms as much. *See United States v. Gonzales*, No. 10CR967-CW, 2011 WL 5288727 (D. Utah. Nov. 2, 2011) (unpublished). So does the history of amendments to the law, which indicates that short-barreled rifles "are not typically used for lawful purposes" and "'are primarily weapons of war.'" *Id*. at *5 (citation omitted). In other words, "a long gun with a shortened barrel is both dangerous, because 'its concealability fosters its use in illicit activity,' and unusual, 'because of its heightened capability to cause damage.'" *Cox*, 906 F.3d at 1185 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)).

**Page 22 of 24**

Short-barreled rifles are a far cry from common weapons like handguns, "the most popular weapon chosen by Americans for self-defense in the home," in both nature and number. *Heller*, 554 U.S. at 629. Indeed, the number of common weapons like pistols, revolvers, rifles, or shotguns produced in a single year exceeds the total number of registered short-barreled rifles.[2] There is thus ample reason to deem short-barreled rifles dangerous and unusual weapons that legislatures may ban or otherwise regulate.

## IV.   CONCLUSION

Accordingly, and for the reasons set forth above, this Court should deny the defendant's motion to dismiss the indictment. *Bruen* did not call into question statutes like Section 922(g)(1) or Section 5861(d). Instead, *Bruen* concerned firearm regulations aimed at "law abiding citizens," not a statute whose own elements limit itself to regulating non-law-abiding citizens. But even if *Bruen* applied, Section 922(g)(1) would still satisfy its historical analogy test because the Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed, and the Nation's historical tradition confirms that felons can be dispossessed of firearms. Furthermore, the interstate commerce element of Section 922(g)(1) is settled law.

---

[2] *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2, 16 (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.    And    even compared to the class of dangerous and unusual weapons covered by the National Firearms Act, short-barreled shotguns are relatively uncommon. Notably, there are fewer registered short-barreled rifles (a little over half a million) than destructive devices (3.3 million), machine guns (over 700,000), and silencers (2.6 million). See id. at 2.

Section 5861(d) would also satisfy *Bruen*'s historical analogy if applied, as regulation of dangerous and unusual weapons well-accepted.

Respectfully submitted,

BRANDON B. BROWN
United States Attorney

*/s/ J. Aaron Crawford*
J. Aaron Crawford (LA No. 31682)
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101
Phone: 318-676-3600

**Page 24 of 24**